UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LESTER DOBBEY (#R-16237), | ) |
| Plaintiff, | ) Case No. 11 C 3000 |
| | ) Judge Robert M. Dow, Jr. |
| MICHAEL RANDLE, et al., | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lester Dobbey, an inmate at Illinois's Stateville Correctional Center, has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff claims that Defendants Marvin Reed, an assistant warden, and Leslie Turner, an intelligence officer, violated Plaintiff's constitutional rights by retaliating against him for exercising his First Amendment rights. More specifically, Plaintiff alleges that he was subjected to an unnecessary shakedown of his cell and false discipline because he filed grievances and a lawsuit against Defendant Reed. This matter is before the Court for ruling on the parties' cross-motions for summary judgment, [63], [68], and Plaintiff's motion for an *in camera* offer of proof [74]. For the reasons stated below, the Court denies Plaintiff's motion for an *in camera* offer of proof [74], denies Plaintiff's motion for summary judgment [68], and grants Defendant's motion for summary judgment [63].

**I.      Local Rule 56.1**

Together with their motion for summary judgment, Defendants filed and served on Plaintiff a "Notice to *Pro Se* Litigant Opposing Motion for Summary Judgment" [66], as required

by Local Rule 56.2.  That notice explained in detail the requirements of the federal and local rules governing summary judgment, including Federal Rule of Civil Procedure 56(e) and Local Rule 56.1.  Although *pro se* plaintiffs are entitled to lenient standards, compliance with procedural rules is required.  *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006); *see also Koszola v. Bd. of Educ. of the City of Chicago*, 385 F.3d 1104, 1108 (7th Cir. 2004).  "Indeed, the Seventh Circuit has "repeatedly held that district judges are entitled to insist on strict compliance with local rules designed to promote the clarity of summary judgment filings." *Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011);  *Cichon v. Exelon Generation Co.*, 401 F.3d 803, 809 (7th Cir. 2005).

Despite the notice given to him concerning the requirements of Local Rule 56.1, many of Plaintiff's statements of fact are deficient with respect to their general citations to the record. Local Rule 56.1(b)(3)(B) requires the non-movant's response, in pertinent part, to make "specific references to the affidavits, parts of the record, and other supporting materials relied upon." Reference to an entire document does not comply.  See *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004); see also *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1006-07 (7th Cir. 2004); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2002) ("[C]itations must include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document * * * * Factual allegations not properly supported by citation to the record are nullities.").

Because Plaintiff is proceeding *pro se*, the Court has granted him some leeway and considered the factual assertions that he makes in his summary judgment materials to the extent that he could properly testify about the matters asserted.  Among other things, a witness may not

testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Fed. R. Evid. 602.

Given the considerations stated above, the Court views the following facts as uncontested for purposes of the parties' cross-motions for summary judgment, except as otherwise stated. The Court takes the facts primarily from Defendants' Local Rule 56.1 statements, [65] and [71], and Plaintiff's Local Rule 56.1 statements, [69] and [75], subject to the caveats described above.

## II. Background

Plaintiff is an Illinois state prisoner and was confined at the Stateville Correctional Center at all times relevant to this action. [65] ¶ 1. Defendant Marvin Reed was the facility's Assistant Warden from January 2008 through October 16, 2009. *Id.* ¶ 2. Defendant Leslie Turner was an Intelligence Officer at Stateville from February 2001 through July 2012. *Id.* ¶ 3.

In December 2008, Plaintiff filed a mandamus action in the Will County Circuit Court concerning the quality of the medical care that he was receiving at Stateville. [69] Ex. A; [71] ¶ 3. The named defendants were the Illinois Department of Corrections and the Stateville Correctional Center. See [69] Ex. A. Neither Defendant Reed nor Defendant Turner was a named defendant. See *id.*

In March 2009, Plaintiff filed a supplemental petition to update the allegations in his mandamus action. See *id.* The supplemental petition included allegations that Plaintiff told Defendant Reed on February 5, 2009 that he was dissatisfied with his medical treatment. See *id.* In his response to Plaintiff's First Set of Interrogatories, Defendant Reed stated that he did not recall having had any conversations with Plaintiff about medical issues, see [69] Ex. E, ¶¶ 5-9, and reiterated that position in his response to Plaintiff's statement of facts. See [71] ¶ 9.

Defendant Reed concedes that he was at Stateville on February 5, 2009, however. See [69] Ex. D; [71] ¶ 8.

On April 23, 2009, Plaintiff failed to appear for a status hearing in the mandamus matter. The circuit court noted on the docket that there had been "[n]o proof of service as to defendant" and cautioned that the case would be dismissed for want of prosecution if Plaintiff failed to properly serve the defendants. [8] Ex. B. The court's docket reflects that summonses were issued to "Warden F. Shaw" and "Director Roger E. Walker" on May 6, 2009. See *id.* When the matter came up for status again on June 25, 2009, the court noted that Plaintiff again failed to appear and that any service that he had effected had been improper. See *id.* The court explained that "Service must be obtained by Sheriff and cannot be made thru the mail," and gave Plaintiff "additional time to obtain service." *Id.* Plaintiff made numerous filings on August 24, 2009, including both supplemental and amended petitions, and filed proof of service and another amended petition on August 25, 2009. See *id.* On August 27, 2009, however, the circuit court noted for a third time that there was "[n]o proper service in file" and dismissed the matter for want of prosecution. *Id.*; see also [65-4] at 13-14. There is no evidence that Defendant Reed or Defendant Turner was served; the Circuit Court docket sheet submitted by Plaintiff shows that neither Defendant Reed nor Defendant Turner, nor any unnamed assistant wardens or intelligence officers, was issued a summons.[1] Both Defendants testified that they were not served and were unaware of the suit. See [65-2] ¶ 2; [65-3] ¶ 3.

---

[1] Plaintiff submitted a summons as an exhibit to his summary judgment motion. [69] Ex. B. The summons bears a stamp indicating that it was received by the Stateville Warden's Office on March 27, 2009. See *id.* However, the summons bears no filing stamp or other indicia that the Will County Circuit Court issued the summons and Plaintiff has not provided an executed, properly or otherwise, return of service. Furthermore, the summons is directed to the Illinois Department of Corrections and the Stateville

On April 1, 2009, Plaintiff filed an eight-page grievance regarding his medical care. [69] Ex. C. The grievance reiterated Plaintiff's allegations as to the February 2009 conversation with Defendant Reed and also included allegations pertaining to several other correctional officials. See *id.* Plaintiff does not allege, see [69], and there is no indication on the grievance itself (no signature by Defendant Reed, no received stamp from his office, etc.), that Reed was apprised of the April 1, 2009 grievance. See [69] Ex. C. at 3. Notes on the grievance indicate that it was to be forwarded to Stateville's health care unit and grievance officers, see *id.* at 1, and a stamp indicates that the Office of Inmate Issues received the grievance on January 7, 2010. See *id.*

On September 2, 2009, some five months after Plaintiff filed the grievance but only a few days after Plaintiff's mandamus suit was dismissed for want of prosecution, a team of intelligence officers conducted cell searches (or "shakedowns") of several cells in Plaintiff's housing unit. [65] ¶ 8. Defendant Turner has testified[2] that the shakedowns were part of an internal affairs investigation unrelated to Plaintiff. See [65-3] ¶ 4. Plaintiff himself acknowledged in his grievance form, see [65-6], and deposition, see [65-4] at 16-17, that at least

---

Correctional Center, not Defendant Reed (who was not the warden but an assistant warden) or Defendant Turner, and both Defendants testified that they were never served.

[2] In his "Motion For An In Camera Offer-of-Proof," [74], Plaintiff contends that this testimony is "self-serving and should not be solely rested upon when considering Defendants['] Motion for Summary Judgment." [74] ¶ 7. Plaintiff alleges that all of the affidavit testimony submitted by Defendants represents an attempt "to intentionally use deceptive statements to circumvent liability in this case." *Id.* ¶ 2. These contentions miss the mark. The Seventh Circuit "long ago buried – or at least tried to bury – the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.'" *Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010); see also *Hill v. Tangherlini*, --- F.3d --- , 2013 WL 3942935, at *2 (7th Cir. Aug. 1, 2013). "If based on personal knowledge or firsthand experience, such testimony can be evidence of disputed material facts." *Berry*, 618 F.3d at 691. Such testimony is "perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill*, --- F.3d at ---, 2013 WL 3942935, at *2. The Court therefore denies Plaintiff's motion for an offer of *in camera* proof [74] and will consider the uncorroborated testimony of all parties, including Plaintiff, see, *e.g.*, [69] Ex. F & G, in resolving the cross-motions for summary judgment.

one other cell in his cellblock was searched that day, and has maintained from the outset that the officers who performed the shakedown were "IDOC Internal Affair[s]/Intelligence Officers." [8] ¶ 30. Defendant Turner was one of the officers who searched Plaintiff's cell. [65-3] ¶ 3. Defendant Turner testified that prior to the shakedown, he had never been named in or served with any lawsuit filed by Plaintiff and was unaware of any lawsuits that Plaintiff may have filed against him. *Id.* ¶ 2. Defendant Turner expressly denied that Plaintiff was targeted for retaliation. *Id.* ¶ 4.

Before searching Plaintiff's cell, Defendant Turner and another officer not named as a defendant, Officer Schwartz, patted Plaintiff and his cellmate down and placed them, handcuffed, in the cellhouse's "bullpen." See [69] Ex. F. During their search of Plaintiff's cell, which Plaintiff testified lasted "for like 2½ hours," [69] Ex. G, the officers discovered a radio with a wire attached to it as an antenna, as well as an altered pair of trimmers that seemed to have been modified to function as a tattoo gun. [65-4] at 6. The radio had Plaintiff's name engraved on it. [65-5]. The officers also observed that Plaintiff had several tattoos on his arm that had not been documented when he was admitted to Stateville in October 2002. [65-4] at 6-7.

Defendant Reed testified that he did not order or participate in the shakedown of Plaintiff's cell. See [65-2] ¶¶ 3-4. Plaintiff testified that Defendant Reed walked by the bullpen "after internal affairs searched [his] cell then left." [69] Ex. G; see also [65-4] at 14. Plaintiff "attempted to stop [Defendant Reed] right there and that," but Defendant Reed and his companion, Major Lake, did not stop and continued toward "four gallery" where Plaintiff's cell was located. [65-4] at 14; [69] Ex. G. Plaintiff contends that this attempted encounter happened

"approximately three to four minutes behind Internal Affair[s Officers] Turner and Schwartz['s] exit from Bravo House." [69] Ex. G.

After the search had concluded but while he and his cellmate were still in the bullpen, Plaintiff asked cellblock guard Lieutenant Michelle if he could return to his cell. Lieutenant Michelle told Plaintiff that the inmates housed in Cell #415 could go back to their cells, but that Plaintiff and his cellmate (who were housed in Cell #416) were going to be placed in punitive segregation. See [65-6]. Plaintiff claims that he was given no explanation as to why he would be placed in segregation. See *id.*

A few minutes later, Defendant Reed and Major Lake walked by the bullpen again. See [65-4] at 14-16. This time, the duo stopped. See *id.* According to Plaintiff's affidavit testimony, Plaintiff "stopped him and said [Plaintiff's] name." [69] Ex. G. In response, Defendant Reed said to him, as "if it [were] a joke," "I know who you are, you're the grievance, lawsuit man." [69] Ex. G.[3] According to Plaintiff's deposition testimony, Plaintiff asked Defendant Reed why he would be going to segregation. See [65-4] at 15. According to Plaintiff's deposition testimony, Defendant Reed said something to the effect of, "You know why you're going to seg," to which Plaintiff responded, "No, I don't," and Defendant Reed replied something to the effect of "You know, you fucked with me or whatever," and "made mention of the grievances." *Id.* In his affidavit, Plaintiff provides more detail about this conversation. See [69] Ex. G. There, he contends that Defendant Reed responded to his query with, "I just talked to [Defendant] Turner before they had c[o]me over to the cell-house," and then said, "You know you fucked up, fucking

---

[3] According to the affidavit testimony of Plaintiff's cellmate, Defendant Reed told Plaintiff, "I know who you are; [t]he law clerk right. The guy who files all the grievances and law suits, right." [8] Ex. D. Viewed in the light most favorable to Defendants, which is how the Court views the evidence in considering Plaintiff's cross-motion for summary judgment, this testimony could suggest that Defendant Reed knew Plaintiff in his capacity as law clerk, not as litigant.

with me in your grievance." *Id.*; see also [65-6]. Plaintiff responded, "I didn't lie in it!" [69] Ex. G. In both his deposition, [65-4] at 15, and his affidavit, [69] Ex. G, Plaintiff testified that Defendant Reed mentioned to Major Lake that Plaintiff "had the nerve to put me in his grievances and lawsuit." Plaintiff admits that his conversation with Defendant Reed did not take place until after his cell already had been searched and he had already been informed that he and his cellmate would be going to segregation. See [65-4] at 15-16.

Defendant Reed's interrogatory answers indicate that he does not remember whether he talked to Plaintiff on September 2, 2009, see [69] Ex. E, and he has taken the same position in his response to Plaintiff's statement of facts. See [71] ¶ 15. Records indicate, see [69] Ex. D, and Defendants concede, see [71] ¶ 14, that Defendant Reed was present at Stateville that day. Defendant Reed has submitted affidavit testimony stating that he never associated Plaintiff with filing more grievances than other inmates, both in general and specifically grievances involving himself. [71-1].

Plaintiff and his cellmate were placed in segregation immediately upon leaving the bullpen. [69] Ex. G. Defendant Turner issued Plaintiff a disciplinary ticket for having contraband – the radio and the trimmers, the latter of which Plaintiff's cellmate ultimately took responsibility for. [8] Ex. F. The ticket also cited Plaintiff for committing a health and safety violation by acquiring the extra tattoos. See *id.* Plaintiff received the ticket on September 9, 2009, after it was reviewed by a reviewing officer and hearing investigator (neither of whom was Defendant Reed or Defendant Turner). See *id.*

A hearing on the charges was held on September 16, 2009. [65-5]. Neither Defendant served on the Adjustment Committee that reviewed the charges. See *id.*; see also [65-2]. Plaintiff

pleaded guilty to the contraband charge for the radio but contested the health and safety charge related to the tattoos. See [65-5]. He claimed that he always had the tattoos on his arm. See *id.* (At his deposition, he testified that he did not have the tattoos when he first arrived at Stateville and explained that he had acquired them while temporarily housed at the Cook County Jail. See [65-4] at 11-12; see also [65-6].) The Adjustment Committee discredited Plaintiff's explanation that his tattoos pre-dated his arrival at Stateville. See [65-5]. The Adjustment Committee noted that both Plaintiff's OTS profile and pre-sentence report documented only two mask tattoos when he entered the IDOC system, but that he currently had more. See *id.* The Adjustment Committee thus found Plaintiff guilty of two charges: (1) possession of contraband or unauthorized property, and (2) health, smoking, or safety violations. See *id.* (Plaintiff was absolved of responsibility for the altered trimmers because his cellmate claimed ownership of them. See *id.*) The Adjustment Committee imposed discipline of three months in segregation, three months' demotion to "C grade," and three months of commissary restrictions. See *id.*; see also [65-4] at 7-8. Plaintiff also lost his job as a law library research clerk, see [71] ¶ 31, and he claims that some of his personal property was stolen and destroyed while he was in segregation. See [65-4] at 17; see also [68] at 10. Plaintiff's cellmate also was disciplined with three months of segregation, see [65-4] at 9, and, according to the cellmate, the same "C grade" and commissary restrictions as Plaintiff. See [8] Ex. D.

On October 15, 2009, while he was in segregation, Plaintiff filed two grievances. The first, four-page grievance challenged the validity of the health and safety violation and alleged "Retaliatory Treatment by A/W Reed." See [65-6]. In this grievance, Plaintiff alleged that Defendant Reed used the officers who conducted the search, including Defendant Turner, as "his

personal hitmen" to drum up "a false charge because [Plaintiff] put him in [the] grievance previously, and to get [Plaintiff] fired." *Id.* Plaintiff requested expungement of the health and safety violation, reinstatement to his job as a law library research clerk, and "not to be further retaliated against for writing grievances." *Id.* In the second October 15, 2009 grievance, which spanned nine pages, Plaintiff reiterated his allegations about the September 2, 2009 conversation with Defendant Reed. He also provided a lengthy narrative outlining his September 16, 2009 disciplinary hearing and subsequent conversations he had with Lieutenant Franklin, a member of the Adjustment Committee and segregation cellhouse lieutenant. According to this grievance, the disciplinary action against Plaintiff was only the second since his arrival at Stateville but Lieutenant Franklin told Plaintiff that unnamed internal affairs officers had "told him not to be [lenient]." *Id.* Plaintiff alleged that Defendant Turner and Officer Schwartz falsely charged him with violating Illinois Department of Corrections Rules "without first properly investigating the allegations that were alleged in the Disciplinary Report." *Id.* He also claimed that Defendant Turner and Officer Schwartz "came to search [his] cell on 9/2/09, in some form of harassment or retaliation, due to [his] status of filing grievances and civil litigation." *Id.* Plaintiff reiterated his request to be reinstated as a law clerk, and further requested that Defendant Turner and Officer Schwartz be suspended without pay and removed from the internal affairs unit. *Id.* Plaintiff avers that his October 15, 2009 grievances were denied at all levels of review. See [8] ¶¶ 56-58; *id.* Ex. J.

On December 3, 2009, after he was released from segregation, Plaintiff filed a grievance alleging that some of the personal property he kept in his regular cell – a number of cassette tapes and a variety of food items purchased from the commissary – had gone missing while he was in

-10-

segregation. See [69] Ex. N. Plaintiff also alleged that his television was returned to him broken. See *id.* The grievance was denied at every level of review, through and including the Administrative Review Board. The Administrative Review Board noted that food items "were not allowed in segregation and were destroyed due to health concerns," but found Plaintiff's other allegations unsubstantiated. *Id.* Defendants admit that Plaintiff's food items were destroyed but deny that Plaintiff's cassette tapes were destroyed and that his television was broken. See [71] ¶ 32.

## III. Summary Judgment Standard

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On cross motions for summary judgment, the Court construes all facts and inferences "in favor of the party against whom the motion under consideration is made." *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006) (quoting *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005)); see also *Gross v. PPG Indus., Inc.*, 636 F.3d 884, 888 (7th Cir. 2011); *Foley v. City of Lafayette, Ind.*, 359 F.3d 925, 928 (7th Cir. 2004). To avoid summary judgment, the opposing party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation omitted).

A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Summary judgment is proper against "a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322. The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [opposing] position will be insufficient; there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson,* 477 U.S. at 252.

IV.   **Analysis**

To establish a *prima facie* case of retaliation, an inmate must produce evidence that a protected activity was "'at least a motivating factor' in retaliatory action taken against him, *i.e.*, action that would likely deter protected activity in the future." *Mays v. Springborn*, 719 F.3d 631, 635 (7th Cir. 2013) (quoting *Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009)). That is, he must show three things: (1) that he engaged in constitutionally protected speech; (2) that he suffered a deprivation likely to deter future protected speech; and (3) that his protected speech was at least a motivating factor in the defendants' actions. See *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012); see also *Antoine v. Ramos*, 497 F. App'x 631, 633 (7th Cir. 2012) (citing *Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012)). If the inmate satisfies these elements, the burden shifts to the defendants, who must rebut the causal inference with evidence showing that they would have taken the same action even without any retaliatory motive. *Mays*, 719 F.3d at 635; *Antoine*, 497 F. App'x at 633; *Mays*, 575 F.3d at 650. The defendants cannot be found liable if they would have conducted the shakedown no matter what. *Antoine*, 497 F. App'x at 634. Thus, "[i]f the defendants produce evidence that they would have taken action against

[Plaintiff] even in the absence of his speech, [Plaintiff] would also have to show that those reasons were pretextual." *Swearingen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 861 (7th Cir. 2010). "At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." *Zellner v. Harrick*, 639 F.3d 371, 379 (7th Cir. 2011); see also *Valentino v. Vill. of S. Chi. Heights*, 575 F.3d 664, 670 (7th Cir. 2009) ("[T]he plaintiff may still reach trial by producing sufficient evidence to allow a reasonable fact finder to determine that the [defendant's] reasons were merely a pretext for [the adverse action], at least in part, for exercising her First Amendment rights.").

Grieving about prison conditions is, of course, protected First Amendment activity. *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012). "Prisoners are entitled to utilize available grievance procedures without threat of recrimination." *Hoskins v. Lenear*, 395 F.3d 372, 375 (7th Cir. 2005); see also *Whitfield v. Snyder*, 263 F. App'x 518, 521 (7th Cir. 2008) (same)). Likewise, inmates have a First Amendment right to file lawsuits, and officers may not retaliate against them for exercising that right. See *Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005); *cf. Dobbey v. Ill. Dep't of Corr.*, 574 F.3d 443, 446 (7th Cir. 2009). Plaintiff has satisfied his burden of demonstrating that he engaged in protected conduct.

Plaintiff also has offered evidence from which a reasonable fact finder could conclude that he suffered an adverse action or deprivation. Uncontroverted evidence demonstrates that he was subject to a shakedown on September 2, 2009, and that he was disciplined and suffered other adverse consequences as a result. See *Antoine*, 497 F. App'x at 633 (considering a shakedown and resultant disciplinary charges as deprivations for purposes of a retaliation claim). Trumped-

up disciplinary action – or even disciplinary action that would have been proper when taken for a different reason – violates an inmate's rights if the discipline is imposed in retaliation for the exercise of a constitutional right. *See, e.g.*, *Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012); *Bridges v. Gilbert*, 557 F.3d 541, 552 (7th Cir. 2009); *Lekas*, 405 F.3d at 614.

Plaintiff has not shown, however, that retaliatory animus on the part of either Defendant motivated the September 2, 2009 shakedown or the subsequent disciplinary action. In his motion for summary judgment [68], Plaintiff lays out the "causal connection between the protected speech and the retaliation" as follows: "Defendant Reed, came over to Plaintiff's cell-house to watch the progress of Defendant Turner's unlawful act. Then with arrogance Defendant Reed, tells Plaintiff: (1) he knew who he (Plaintiff) was; (2) Plaintiff was the grievance, lawsuit man; (3) Plaintiff knew why he was going to segregation; (4) Plaintiff had fucked-up. Fucking with Def. Reed in your grievance; (5) Def. Reed had talked to Def. Turner prior to Plaintiff's cell search; and (6) when Def. Reed tells Major-Lake that Plaintiff had the 'nerve' to put Def. Reed in Plaintiff's grievance and lawsuit." [68] at 11-12 (errors in original). Plaintiff also argues that "Defendant Turner, wrongfully engineered Plaintiff's punishment by fabricating a serious charge knowing that the falsehood would lead to the Plaintiff's immediate placement in the hole without any intervening hearing" and then "land him with 3 months in segregation." *Id.* at 12.

Even if a factfinder were to view the evidence in Plaintiff's favor and draw the inferences necessary to support the "causal connection" Plaintiff alleges, there is still no evidentiary basis to support Plaintiff's speculation that Defendant Reed had anything to do with the initiation of the shakedown or that his conversation with Defendant Turner alerted the latter to the grievances and lawsuits (which did not name Defendant Turner), prompted him to conduct the shakedown, or

otherwise directed him to issue the disciplinary ticket. See [65-4] at 12 ("Q. And I believe it's your contention in the lawsuit that [Defendant Turner] was put up to writing this ticket by Marvin Reed? A. Yes."). It is well established that cell searches are constitutionally permissible. See *Bell v. Wolfish*, 441 U.S. 520, 558-60 (1979); *Hudson v. Palmer*, 468 U.S. 517, 526 (1984); *Santiago v. Anderson*, 496 F. App'x 630, 633 (7th Cir. 2012) (inmates have no expectation of privacy in their cells); *cf.* Ill. Admin. Code. tit. 20 § 501.220(b)(1) ("All committed persons and their clothing, property, housing and work assignments are subject to search at any time."). And Plaintiff admits that the shakedown was conducted by investigatory officers and was not confined to or solely directed at his cell.

To the extent that Plaintiff suggests that the sequential nature of the grievances, lawsuit, shakedown, and disciplinary action is itself sufficient to give rise to an inference of retaliation, his claim cannot go forward on this suggestion alone. "[S]uspicious timing alone is rarely sufficient to defeat a motion for summary judgment," *Silverman v. Bd. of Educ. of City of Chi.*, 637 F.3d 729, 736 (7th Cir. 2011), and the temporal proximity here is weak at best as Plaintiff's grievances and lawsuit predate the shakedown and discipline by several months. *Contra Mays v. Springborn*, 575 F.3d 643, 650 (7th Cir. 2009) ("Mays presented a chronology of events from which retaliation could be inferred: *almost immediately* after making his protected complaint about strip searches, the guards subjected him to a much more onerous search." (emphasis added)); *Marshall v. Knight*, 445 F.3d 965, 971 (7th Cir. 2006) ("Marshall's allegations that *almost immediately* after he filed his complaint the defendants placed him on 'idle' status with no pay, authorized other inmates to charge him fees for library access, deprived him of educational and vocational opportunities, denied him a transfer to a minimum security facility, and placed

him with violent cell mates, certainly amount to a chronology from which retaliation may be inferred." (emphasis added)). Of course, this is not to say that defendants can negate a finding of causal connection simply by delaying their retaliatory behavior in the wake of an inmate's protected conduct. But neither is Plaintiff exempt from routine prison operations simply because he frequently files grievances and lawsuits. *Cf. Hall v. Bodine Elec. Co.*, 276 F.3d 345, 359 (7th Cir. 2002), *overruled in part on other grounds by Hill v. Tangherlini*, --- F.3d ---, 2013 WL 3942935, at *2 n.1 (7th Cir. Aug. 1, 2013) ("[A]n employee's complaint of harassment does not immunize her from being subsequently disciplined or terminated for inappropriate workplace behavior."). At bottom, Plaintiff's conclusion that the shakedown of his cell was retaliatory is entirely speculative and unsupported by the evidence.

The same is true of Plaintiff's claims about the discipline to which he was subject in the wake of the shakedown. Plaintiff was written up for possessing contraband and unauthorized tattoos, both of which were discovered during the search. Plaintiff proceeded to a hearing on both charges within two weeks, and pleaded guilty to possessing the contraband radio, thus demonstrating that the charge was not false. He has not demonstrated that the punishment he received for admittedly possessing the radio and the unauthorized tattoos was "trumped up" or out of line with punishment imposed on similarly situated inmates found guilty of similar infractions.[4] Indeed, to the contrary, Plaintiff testified that his cellmate also "did three months of segregation" for possessing the contraband trimmers. [65-4] at 9. (Plaintiff's cellmate testified that he, like Plaintiff, was "given 90 days segregation, 90 days C-grade and 90 days commissary

---

[4] It is immaterial that, on at least two occasions in 2012, inmates who illegally altered their radios did not receive disciplinary segregation. See [75]. There is nothing in the record indicating that these inmates also faced charges related to both their radios and health and safety violations, that they had similar disciplinary records to Plaintiff, and that Stateville's regulations regarding altered radios remained the same between 2009 and 2012.

den[ia]l." [8] Ex. D.) Plaintiff further has not pointed to any evidence suggesting that either Defendant had any involvement in Plaintiff's disciplinary hearing or the determination of what punishment would be imposed. At best, a reasonable factfinder could infer that one of Defendants was the unidentified individual who told Lieutenant Franklin not to be lenient in determining Plaintiff's punishment. The same (and only) evidence of this purported conversation reflects, however, that Lieutenant Franklin told Plaintiff that he and the other members of the Adjustment Committee responsible for adjudicating Plaintiff's guilt and assessing his punishment "didn't max [Plaintiff] out." [65-6]. Even if Defendants did advise a particularly harsh punishment, there is no evidence that Plaintiff received one.

As for his missing and broken personal property, Plaintiff has not presented any evidence demonstrating or even suggesting that Defendants had any responsibility for it. He testified at his deposition that he "can't say" whether Defendants had anything to do with the missing and broken property, and that "whether they have any part to do with that, [he] can't pinpoint it." [65-4] at 17-18. Without some evidence of Defendants' involvement in the conduct, no reasonable factfinder could conclude that it was prompted by their retaliatory motives. On the record as it stands, no reasonable jury could conclude that the shakedown or that the consequences that flowed from it impermissibly targeted Plaintiff or were retaliatory in nature.[5]

---

[5] Nor could a reasonable jury conclude that Defendant Turner violated the Eighth Amendment's prohibition on cruel and unusual punishment by performing the shakedown or issuing the disciplinary ticket. To prevail on an Eighth Amendment claim, to which he made a few allusions, see [8] ¶ 64; [68] at 2, Plaintiff would have to show that Defendant Turner imposed conditions that denied him the "minimal civilized measure of life's necessities" and in so doing disregarded a substantial risk that Plaintiff would be seriously harmed. *Gillis v. Litscher*, 468 F.3d 488, 492 (7th Cir. 2006). Plaintiff has not done so, and it appears from the facts adduced at summary judgment that Plaintiff only is pursuing his retaliation claims.

Moreover, even assuming that Plaintiff did establish the three elements of a *prima facie* retaliation claim, Defendants have met their burden of showing that the same actions would have been taken absent any retaliatory motive. *See Mays*, 719 F.3d at 635; *Kidwell*, 679 F.3d at 967; *Greene*, 660 F.3d at 979; *Mays*, 575 F.3d at 650. Whether or not Defendant Turner or Defendant Reed was aware of Plaintiff's grievances and lawsuits, Plaintiff has not provided any evidence beyond his own speculation to refute Defendants' admissible testimony that the shakedown was part of an investigation unrelated to Plaintiff and was not ordered or supervised by Defendant Reed.[6] Furthermore, Plaintiff has admitted both that he altered his radio to attach an antenna and that he has collected additional tattoos since he was first remanded to IDOC custody. Plaintiff therefore cannot reasonably argue that the disciplinary action was unjustified, nor has he presented any evidence to support such an argument. Defendants successfully have rebutted any causal inference. "[I]f the defendants produce evidence that they would have taken action against [Plaintiff] even in the absence of his speech, [Plaintiff] would also have to show that those reasons were pretextual." *Swearingen-El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 861 (7th Cir. 2010); see also *Greene*, 660 F.3d at 979-80. "At the summary judgment stage, this means a plaintiff must produce evidence upon which a rational finder of fact could infer that the defendant's proffered reason is a lie." *Zellner v. Harrick*, 639 F.3d 371, 379 (7th Cir. 2011). Plaintiff has not done so. To the contrary, Plaintiff's own evidence contradicts his assertion that he was somehow singled out for punishment, that he was punished baselessly or abnormally harshly, or that he would not have been punished absent a retaliatory motive. Plaintiff concedes

---

[6] Neither the identity of the inmate who was the principal subject of the investigative search nor the nature of the investigation has any bearing on whether Plaintiff was the victim of retaliation. It is enough that Defendants have provided admissible evidence articulating a legitimate, non-retaliatory basis for the shakedown.

that other cells were searched during the shakedown, that he owned the contraband radio recovered during the shakedown, and that both he and his non-grieving cellmate were disciplined equally harshly following the shakedown. He also acknowledges that internal affairs officers have confiscated altered radios and issued disciplinary reports for the infraction "hundreds" of times. [73] at 5.

In sum, Plaintiff admits to having the impermissible radio and tattoos that gave rise to the discipline imposed on him, lacks evidence connecting Defendants to his missing or damaged property, and does not refute Defendants' evidence showing that the shakedown was part of an unrelated investigation and would have occurred absent any retaliatory motive. He therefore has failed to create a genuine issue of material fact for trial. Defendants' motion for summary judgment [63] is granted, and Plaintiff's motion for summary judgment [68] is denied.

## V.     Conclusion

For the foregoing reasons, Plaintiff's motion for *in camera* offer of proof is denied [74], Plaintiff's motion for summary judgment [68] is denied, and Defendants' motion for summary judgment [63] is granted. The record belies any inference that Defendants punished Plaintiff for engaging in activity protected by the First Amendment. The Court is satisfied that, even viewing the record in the light most favorable to Plaintiff, no reasonable jury could find that Defendants retaliated against him.

If Plaintiff wishes to appeal this final order, he may file a notice of appeal with this Court within thirty days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues Plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C). If Plaintiff does choose to appeal, he will be liable for the full amount of

the appellate filing fee irrespective of the outcome of the appeal. *Evans v. Ill. Dep't of Corr.*, 150 F.3d 810, 812 (7th Cir. 1998). Furthermore, if the appeal is found to be non-meritorious, Plaintiff may also be assessed a "strike" under 28 U.S.C. § 1915(g). Plaintiff is warned that, pursuant to that statute, if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to state a claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury. *Id.*

Dated: September 10, 2013                              _____
                                                                                 Robert M. Dow, Jr.
                                                                                 United States District Judge